1  Joseph W. Cotchett (SBN 36324)
2  Adam J. Zapala (SBN 245748)
   Elizabeth T. Castillo (SBN 280502)
3  James G.B. Dallal (SBN 277826)
   Reid W. Gaa (SBN 330141)
   **COTCHETT, PITRE & McCARTHY, LLP**
4  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
5  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
6  jcotchett@cpmlegal.com
   azapala@cpmlegal.com
7  ecastillo@cpmlegal.com
   jdallal@cpmlegal.com
8  rgaa@cpmlegal.com

9  *Attorneys for Plaintiffs Sigurd Murphy and Keith Uehara*

10

11                **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13  SIGURD MURPHY and KEITH UEHARA, on          Case No. _____
    behalf of themselves and all others similarly
14  situated,
                                                **CLASS ACTION COMPLAINT FOR**
15            Plaintiffs,                        **VIOLATIONS OF:**

16       v.                                      **1.  SHERMAN ACT §§ 1, 2,**

17  CELESTRON ACQUISITION, LLC,                  **2.  CLAYTON ACT § 7,**
18  NANTONG SCHMIDT OPTO-ELECTRICAL
    TECHNOLOGY CO. LTD.,                         **3.  STATE ANTITRUST LAWS,**
19  NINGBO SUNNY ELECTRONIC CO. LTD.
    OLIVON MANUFACTURING CO. LTD.,               **4.  STATE CONSUMER**
20  OLIVON USA, LLC,                             **PROTECTION LAWS, and**
    SKY-WATCHER CANADA,
21  SKY-WATCHER USA,                             **5.  UNJUST ENRICHMENT**
    SUZHOU SYNTA OPTICAL TECHNOLOGY
22  CO., LTD.,                                   **JURY TRIAL DEMANDED**
    SW TECHNOLOGY CORP.,
23  SYNTA CANADA INTERNATIONAL
    ENTERPRISES LTD., and
24  SYNTA TECHNOLOGY CORP. OF
    TAIWAN,
25
              Defendants.
26

27

28

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................1

II. JURISDICTION AND VENUE .........................................................................3

III. PARTIES .............................................................................................................5

    A. Plaintiffs ...................................................................................................5

    B. Defendants ...............................................................................................5

        1. The Synta Defendants ...............................................................5

        2. The Sunny Defendant ...............................................................8

    C. Agents and Co-Conspirators ...................................................................8

        1. The Synta Co-Conspirators .......................................................8

        2. The Sunny Co-Conspirators ....................................................10

        3. Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates ....................................................11

        4. Defendants' High-Level Employees Organized the Conspiracy and Their Subordinate Employees—Including Those of Their United States' Subsidiaries—Executed the Conspiracy ................................12

        5. The Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family .....................................................................................13

        6. The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms ...................15

IV. FACTUAL ALLEGATIONS ...........................................................................15

    A. Consumer Telescopes ...........................................................................15

    B. The Consumer Telescope Markets ........................................................16

        1. The Manufacturing Market ......................................................16

        2. The Distribution Market ..........................................................17

    C. The Defendants Are Liable for the Anticompetitive Conduct Alleged Herein .....17

    D. The Federal Trade Commission's Actions in the Consumer Telescope Market ...19

---

**CLASS ACTION COMPLAINT**                  i

E.      The Defendants and Co-Conspirators Monopolized Different Products in the Consumer Telescope Market ...............................................................................20

F.      The Defendants and Co-Conspirators Colluded on Sunny's Acquisition of Meade .............................................................................................................................20

G.      The Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets ....................................................................22

H.      Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices ..........................................................................................................22

I.      The Structure and Characteristics of the Consumer Telescope Market Render the Conspiracy More Plausible ...................................................................................29

        1.      The Consumer Telescope Manufacturing and Distribution Markets Have High Barriers to Entry...............................................................................29

        2.      The Consumer Telescope Manufacturing and Distribution Markets Are Highly Concentrated ................................................................................30

        3.      There is Inelasticity of Demand for Consumer Telescopes .....................31

V.      CLASS ACTION ALLEGATIONS ................................................................................31

        A.      California Law Should Be Applied to the Nationwide Indirect Purchaser States' Damages Class ......................................................................................................32

                1.      The Conspiracy Emanated from California: Location of Defendants and Co-Conspirators .......................................................................................33

                2.      The Conspiracy Emanated from California: Location of Individuals .......33

                3.      Specific Targets of the Conspiracy Were from California .......................33

                4.      The Conspiracy Emanated from California: Sheppard Mullin Facilitated the Conspiracy from California .............................................................34

                5.      The Defendants and Co-Conspirators Targeted California .....................34

        B.      Alternatively, Plaintiffs Will Seek to Certify State Damages Classes..................35

VI.     PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY ...................42

VII.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S CLAIMS..........45

        A.      The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims .........................................................................45

        B.      Fraudulent Concealment Tolled the Statute of Limitations..................................46

VIII.   CAUSES OF ACTION ...................................................................................................48

First Cause of Action
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
Restraint of Trade (on behalf of Plaintiffs and the Nationwide Injunctive Class).......48

Second Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Monopolization
(on behalf of Plaintiffs and the Nationwide Injunctive Class)....................................50

Third Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Attempted Monopolization
(on behalf of Plaintiffs and the Nationwide Injunctive Class)....................................51

Fourth Cause of Action
Violation of Section 7 of the Clayton Act (15 U.S.C. § 18) (on behalf of Plaintiffs and
the Nationwide Injunctive Class)................................................................................53

Fifth Cause of Action
Violation of the State Antitrust Laws (on behalf of Plaintiffs and the Damages Class
or, Alternatively, on Behalf of the State Damages Classes).......................................54

Sixth Cause of Action
Violation of State Consumer Protection Laws (on behalf of Plaintiffs and the
Damages Class or, Alternatively, on Behalf of the State Damages Classes) .............73

Seventh Cause of Action Against All Defendants
Unjust Enrichment (on behalf of Plaintiffs and the Damages Class or, Alternatively,
on Behalf of the State Damages Classes) ...................................................................91

IX.   PRAYER FOR RELIEF ................................................................92

X.    JURY DEMAND .........................................................................94

Plaintiffs Sigurd Murphy and Keith Uehara, by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants Celestron Acquisition, LLC, Nantong Schmidt Opto-Electrical Technology Co., Ltd., Olivon Manufacturing Co. Ltd., Olivon USA, LLC, Sky-Watcher Canada, Sky-Watcher USA, Suzhou Synta Optical Technology Co., Ltd., SW Technology Corp., Synta Canada International Enterprises Ltd., Synta Technology Corp. of Taiwan (together, "Synta Defendants"), and Ningbo Sunny Electronic Co. Ltd. ("Sunny Defendant") (collectively, "Defendants"). The conspiracy and conduct alleged herein were engaged in and facilitated by the following entities and individuals ("Co-Conspirators"): Good Advance Industries Ltd., Dar Tson "David" Shen, Jean Shen, Sylvia Shen, Corey Lee, Laurence Huen, Joseph Lupica, and Dave Anderson (together, "Synta Co-Conspirators"); Sunny Optical Technology Co., Ltd., Meade Instruments Corp., Sunny Optics Inc., Wenjun "Peter" Ni, and Wang Wenjian (together, "Sunny Co-Conspirators"). The foregoing entities have been named as Defendants and Co-Conspirators for engaging in a conspiracy to unlawfully fix prices, allocate the market and customers, and unlawful monopolistic conduct in the United States for consumer telescopes. Plaintiffs hereby allege, on information and behalf, except as to those allegations which pertain to themselves, as follows:



*Source:* https://www.shutterstock.com/video/search/astronomer-looking-through-telescope

## I.    INTRODUCTION

1.      Astronomy is among the oldest hobbies of mankind. Even the occasional backyard

sky watching by unaided eye or a small telescope can be a marvelous experience. Astronomy has inspired thousands of Americans to buy telescopes and learn about the starry names and patterns overhead. These amateur astronomers have experienced joys from intellectual discovery and knowledge of the night sky. Unfortunately, Americans have collectively paid hundreds of millions of dollars in illegal overcharges for telescopes since 2005 as a result of a long-running conspiracy to unlawfully fix the prices, allocate the market and customers, and gain an unlawful monopoly in the United States for telescopes, causing the prices of telescopes to be raised beyond competitive levels.

2.     In November 2016, a California-based distributor and seller of telescopes, binoculars, and accessories, Orion Technologies, Inc. ("Orion") filed a lawsuit in this District against Sunny, identifying its primary competitor, Synta, for conspiring to "divide the market, fix prices, [and] throttle competition" in violation of the Sherman, Clayton, and California Cartwright Acts, as well as California's unfair competition law. *See Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd. et al.*, No. 5:16-cv-06370-EJD-VKD (N.D. Cal.) ("*Orion Litigation*"). Specifically, Orion alleged Sunny and Synta conspired to: (1) fix the prices and credit terms of consumer telescopes purchased in the United States; (2) facilitate Sunny's purchase of Meade Instruments Corp.; and (3) divide the telescope market by product type and allocate customers. Additionally, Orion accused Sunny and Synta of forming, or attempting to form, a monopoly and pushing Orion out of the United States consumer telescope market by refusing to deal with Orion and unlawfully concentrating the market for telescope manufacturing services.

3.     As background, Orion does not manufacture its own products but imports them from Chinese manufacturers like Sunny and Synta, which are the two largest manufacturers of telescopes sold in the United States. Each sells their telescopes to distributors (*e.g.*, Orion, Amazon), which then markets and sells them to consumers online, in stores, through mail-order catalogs, among other means.

4.     Following a six-week jury trial and two days of deliberation, the jury delivered a verdict in favor of Orion on December 5, 2019, awarding Orion $16.8 million in single damages after finding that the defendants had violated the Sherman Act and the Clayton Act by engaging

in a conspiracy to fix the price for, and allocate the market of, telescopes and accessories and to monopolize the domestic consumer telescope market. U.S. District Judge Edward J. Davila delivered a partial final judgment in the amount of $50.4 million by trebling the jury's award and granting post-judgment interest.

5. As a direct result of the anticompetitive and unlawful conduct alleged in the *Orion Litigation* and as alleged herein, Plaintiffs and the Classes (defined *infra*) paid artificially inflated prices for consumer telescopes during the period from and including January 1, 2005 through August 31, 2019 ("Class Period") and have thereby suffered antitrust injury to their property.

## II. JURISDICTION AND VENUE

6. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

7. This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 16), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from the Defendants; and (2) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

8. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendants reside,

are licensed to do business in, are doing business in, have agents in, and are found in or transact business in this District.

9.     This Court has *in personam* jurisdiction over the Defendants because the Defendants either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of telescopes throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix prices and to monopolize that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants Celestron Acquisition, LLC and Sky-Watcher USA are headquartered in California, and Co-Conspirator Meade Instruments Corp. is headquartered in California.

10.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce within the United States.

11.     The activities of the Defendants and Co-Conspirators directly targeted the United States consumer telescope market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of United States interstate commerce.

12.     Telescopes manufactured abroad by the Defendants and Co-Conspirators and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any telescopes are purchased in the United States, and such telescopes do not constitute import commerce, the Defendants and Co-Conspirators' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The

anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

13.     By reason of the unlawful activities hereinafter alleged, the Defendants and Co-Conspirators' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. The Defendants and Co-Conspirators directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices and allocate the market and customers in the United States for telescopes. The conspiracy unreasonably restrained trade and adversely affected the market for consumer telescopes.

14.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased telescopes.

## III.   PARTIES

### A.     Plaintiffs

15.     Plaintiff **Sigurd Murphy** is a California resident who purchased at least one telescope indirectly from Defendants or Co-Conspirators during the Class Period. Mr. Murphy is a retired, amateur astronomer and consumer of telescopes and accessories.

16.     Plaintiff **Keith Uehara** is a Hawaii resident who purchased at least one telescope indirectly from Defendants or Co-Conspirators during the Class Period. Mr. Uehara is a professional photographer, amateur astronomer, and consumer of telescopes and accessories.

### B.     Defendants

#### 1.     The Synta Defendants

17.     **Defendant Synta Technology Corporation of Taiwan** ("Synta Technology") is a company headquartered in Taiwan. Together with its subsidiaries and affiliates, it has sold telescopes into the U.S., Canada, and the European Union during the Class Period. Synta Technology has sold telescopes that were shipped into the Northern District of California. Its

address in Taiwan is No. 89 Lane 4 Chia-An W. Road Lung-Tan Taoyuan Taiwan R.O.C. Synta Technology is a member of Defendants' anticompetitive conspiracy.

18.    **Defendant SW Technology Corporation** ("SW Technology") a Delaware corporation with its principal place of business at 2835 Columbia Street Torrance, California 90503. SW Technology is a subsidiary and wholly owned and/or controlled by its parent, Defendant Synta Technology Corporation of Taiwan. SW Technology manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period. On information and belief, at all times during the Class Period, Dar Tson Shen (*see infra*) established SW Technology in 2005 to acquire Defendant Celestron as a wholly owned subsidiary and continues to operate SW Technology as a holding company.

19.    **Defendant Suzhou Synta Optical Technology Co., Ltd**. ("Suzhou Synta") is a telescope manufacturing company located in Suzhou, China. Suzhou Synta is owned and/or controlled by David Shen and his family, and has manufactured telescopes that were sold into the Northern District of California during the Class Period. Suzhou Synta's principal place of business at No. 65, Yushan Road, New District, 215011, Jiangsu, China. Suzhou Synta is the primary manufacturing subsidiary of Synta Technology. Synta Canada (*see supra*) owns 20 percent of Suzhou Synta. During the Class Period, Suzhou Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District.

20.    **Defendant Nantong Schmidt Opto-Electrical Technology Co. Ltd.** ("Nantong Synta") is a telescope manufacturing company located in Nantong, China. Nantong Synta is owned and/or controlled by David Shen, and has manufactured telescopes that were sold into the Northern District of California during the Class Period, including to Defendant Celestron. Its principal place of business at No. 399 West Zhongshan Rd, Rugao City Jiangsu, China.

21.    **Defendant Celestron Acquisition, LLC** ("Celestron") is a Delaware corporation with its principal place of business at 2835 Columbia Street Torrance, California 90503. Celestron is a subsidiary and wholly owned and/or controlled by its parent, Defendant SW Technology

Corporation, and an affiliate of Defendant Synta Technology Corporation of Taiwan (*see infra*). Celestron manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period. Celestron is the largest importer and distributor of telescopes in the United States.

22. **Defendant Synta Canada International Enterprises Ltd.** ("Synta Canada") is a Canadian corporation with its principal place of business at 4035 Williams Road, Richmond, BC V7E 1J7, Canada. On information and belief, Synta Canada owns 20 percent of Suzhou Synta Optical Technology Co. (*see infra*). Synta Canada manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period.

23. **Defendant Olivon Manufacturing Co. Ltd.** ("Olivon Canada") is a Canadian corporation with its principal place of business at 11880 Hammersmith Way, Richmond, BC V7A 5C8, Canada. On information and belief, Olivon Canada manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period.

24. **Defendant Olivon USA, LLC** ("Olivon USA") is a Nevada corporation with its principal place of business at 701 S Carson Street, Suite 200 200, Carson City, Nevada 89701. On information and belief, Olivon USA manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period.

25. **Defendant Sky-Watcher Canada** is a Canadian corporation with its principal place of business at 11880 Hammersmith Way, Richmond, BC V7A 5C8, Canada. Defendant Synta Technology Corporation of Taiwan established Sky-Watcher Canada in 1999 to sell telescopes manufactured by Defendant Suzhou Synta Optical Technology Co. On information and belief, Sky-Watcher Canada manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period.

26. **Defendant Sky-Watcher USA** is an American corporation with its principal place

of business at 475 Alaska Avenue, Torrance, California 90503. Defendant Synta Technology Corporation of Taiwan established Sky-Watcher USA in the late 2000s to sell telescopes manufactured by Defendant Suzhou Synta Optical Technology Co. On information and belief, Sky-Watcher USA manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in the Northern District of California, during the Class Period.

### 2.     The Sunny Defendant

27.     **Defendant Ningbo Sunny Electronic Co. Ltd.** ("Ningbo Sunny") is a Chinese corporation organized and existing under the laws of China with its principal place of business at 199 An Shan Lu, Yuyao, Ningbo, Zhejiang, China. During the Class Period, Ningbo Sunny—directly and/or through its subsidiaries, which it wholly owned and/or controlled, and through Defendant Celestron (*see supra*) and other distributors—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District.

### C.     Agents and Co-Conspirators

### 1.     The Synta Co-Conspirators

28.     **Co-Conspirator Good Advance Industries Ltd.** ("Good Advance") is a Taiwanese corporation with its principal place of business at No. 89 Lane 4 Chia-An W. Road Lung-Tan Taoyuan Taiwan R.O.C. On information and belief, Good Advance manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period.

29.     **Co-Conspirator Dar Tson ("David") Shen** is the founder, owner, and chairman of the Synta Defendants and Synta Co-Conspirators. These companies are affiliates of each other. Some of them are shell companies and others are holding companies. On information and belief, Mr. Shen and his family, including Jean Shen and Sylvia Shen, controlled the aforementioned 11 entities during the Class Period. Mr. Shen regularly comes to this District to meet with U.S. distributors of Synta products. Even though Mr. Shen founded and oversees Synta, he was concurrently an officer of Ningbo Sunny from 2001 to 2005—a direct, horizontal competitor. In fact, he held a 26 percent ownership stake in Ningbo Sunny until 2005 when Synta acquired

1    Celestron. At that time, he transferred his shares to his sister, Dong Yun Zue, who continues to

2    hold those shares.

3        30.   **Co-Conspirator Jean Shen** participated in the conspiracy alleged herein, including

4    by representing to telescope distributors that Synta's competitor, Co-Conspirator Ningbo Sunny,

5    was one of "my family's companies[.]" She is the sister of Mr. Shen, who exercises control over

6    Defendants Olivon Manufacturing and Olivon USA through Ms. Jean Shen.

7        31.   **Co-Conspirator Sylvia Shen** is a member of Defendant Celestron's executive

8    committee and Defendant SW Technology's CEO, CFO, and Secretary. She participated in the

9    conspiracy alleged herein. She is the sister of Mr. Shen, who exercise control over Defendant

10   Celestron and other Synta affiliates through Ms. Sylvia Shen.

11       32.   **Co-Conspirator Corey Lee** is Defendant Celestron's CEO and resides in

12   California. Mr. Lee participated in the conspiracy alleged herein.

13       33.   **Co-Conspirator Laurence Huen** is Defendant Celestron's board member and Mr.

14   Shen's close advisor and confidante. Mr. Huen participated in the conspiracy alleged herein. Mr.

15   Huen also assisted Defendant Lupica and acted as a conduit of information between horizontal

16   competitors Synta and Sunny.

17       34.   **Co-Conspirator Joseph Lupica** is Celestron's former CEO who—through the

18   collusive arrangements of the Defendants and Co-Conspirators—became the CEO of Meade,

19   Celestron's main, direct horizontal competitor. Lupica resides in Palm Springs, California. Mr.

20   Lupica participated in the conspiracy alleged herein. He began replacing Meade's management

21   with officers from Celestron, including Celestron's Vice President of Sales, Victor Aniceto, who

22   was hired as the Vice President of Sales for Meade. Later, when Defendant Lupica retired, Mr.

23   Aniceto was promoted to President of Meade. Mr. Lupica has admitted that Ningbo Sunny could

24   not have acquired Meade but for the collusive assistance it received from its horizontal competitor

25   Synta.

26       35.   **Co-Conspirator Dave Anderson** is also Celestron's former CEO. Mr. Anderson

27   participated in the conspiracy alleged herein.

28

**CLASS ACTION COMPLAINT**                                                                    9

### 2. The Sunny Co-Conspirators

36. **Co-Conspirator Sunny Optical Technology Co., Ltd.** ("Sunny Optical") is a Chinese corporation organized and existing under the laws of China with its principal place of business at 27-29 Shunke Road, Yuyao, Zhejiang, China. Sunny Optical is an affiliate of Ningbo Sunny. Sunny Optical manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, at all times during the Class Period, Sunny Optical's activities in the United States were under the control and direction of Ningbo Sunny.

37. **Co-Conspirator Meade Instruments Corp.** ("Meade") is a Delaware corporation with its principal place of business at 27 Hubble, Irvine, California 92618. Meade is a subsidiary and wholly owned and/or controlled by its parent, Ningbo Sunny. Meade manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, at all times during the Class Period, Meade's activities in the United States were under the control and direction of its Ningbo Sunny. The only reason Meade Instruments Corp. was not named as a Defendant herein is that it has filed for bankruptcy and doing so would violate the bankruptcy stay (*see* Case No. 8:19-bk-14714-CB (C.D. Cal.)).

38. **Co-Conspirator Sunny Optics Inc.** ("Sunny Optics") is a Delaware corporation formed for the purpose of merging with Meade. Upon information and belief, Sunny Optics is a subsidiary of Ningbo Sunny.

39. **Co-Conspirator Wenjun ("Peter") Ni** is the founder, owner, and CEO of Ningbo Sunny and Meade and, on information and belief, controlled the aforementioned three entities during the Class Period.

40. **Co-Conspirator Wang Wenjian** is the director and controlling shareholder of Sunny Optical and the uncle of Mr. Ni.

41. As indicated above, the Defendants and Co-Conspirators shared certain executives that facilitated the conspiracy. For example, although Mr. Shen founded Synta Technology in 1980, he also served as an officer and vice chairman of its direct competitor, Ningbo Sunny, from

November 2001 to July 2005. Mr. Shen also owned 26 percent of Ningbo Sunny until 2005, at which time he transferred his shares to his sister-in-law, Dong Yun Xue, who continues to hold that interest. As another example, Joe Lupica was the former CEO of both Celestron and Meade, and his transition from CEO at Celestron to CEO at Meade is part of the conspiracy alleged herein.

42.     Defendants acted as the principals of or agents for the unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

43.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

44.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

### 3.     Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates

45.     When Defendants reached agreement on fixing the prices and allocating the market of telescopes—whether as a result of formal or informal meetings or discussions arranged to implement or enforce cartel purposes and agreements—each of the Defendants and Co-Conspirators meant for their collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive efforts regardless of where they were sold.

46.     As part of a single, integrated global enterprise, Defendants and Co-Conspirators manufacture, market, and/or sell telescopes. They sell their telescopes around the world, including in the United States. Accordingly, to achieve the cartel's anticompetitive aims, Defendants and Co-Conspirators effectuated the cartel by establishing pricing and allocating the market in which they compete.

**CLASS ACTION COMPLAINT**                                        11

47.     Foreign-based Defendants and Co-Conspirators established United States (and North American) subsidiaries not only to market and sell their telescopes in the United States but also to effectuate and achieve the cartel's aims and purposes. Without doing so, these corporate entities would have had to perform such functions themselves. These corporate entities chose not to do so and instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers in China.

48.     These United States (and other North American) subsidiaries have no authority to set prices below the prices for telescopes agreed to among the cartel's members. For these subsidiaries, pricing authority largely was held by their Chinese corporate parent or affiliate.

49.     Because their foreign-based corporate parent or affiliate had significant control over all aspects of their business (*e.g.*, type of telescopes, prices, supply, business strategy, customer development and relations, sales, personnel decisions), the United States (and other North American) subsidiaries operated as little more than distribution and sales offices for their foreign-based corporate parent or affiliate. Indeed, the foreign-based corporate parent or affiliate named their own family members employees and officers of their United States' subsidiaries. As a result, the United States (and other North American subsidiaries) were—as intended—able to advance the cartel aims in the United States.

**4.     Defendants' High-Level Employees Organized the Conspiracy and Their Subordinate Employees—Including Those of Their United States' Subsidiaries—Executed the Conspiracy**

50.     The Defendants and Co-Conspirators organized the telescope conspiracy at a high-level within their respective corporate families. Both executives and subordinate employees carried out the conspiracy. Additionally, given the nature of the industry, the subsidiaries and affiliates implemented the conspiratorial agreements within their respective corporate families.

51.     Each of the corporate families alleged herein (*i.e.*, Synta and Sunny) operate not as separate corporate entities but as a single enterprise. Each corporate family holds itself out to the public as a single, integrated enterprise. Each of the parent and/or foreign entities named in this case operate a hierarchical corporate structure wherein they treat subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

52.     Each corporate parent alleged herein also coordinates and manages the finances and meetings between officers from each of the different subsidiaries to facilitate an integrated enterprise to link the various supply chains to the corporate families' clients. The parent defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the United States subsidiaries.

53.     In light of the fact that the U.S. subsidiaries named in this Complaint were treated as mere distribution and sales offices of the Chinese parent or foreign affiliate, they were generally kept informed about the competitor meetings and discussions occurring abroad and were not permitted to undercut the pricing and market allocation agreements reached during those meetings and discussions.

54.     By virtue of their integrated enterprises, and by virtue of the other allegations in this complaint, each Defendant and Co-Conspirator entered into the conspiracy alleged herein on behalf of, and reported these meetings and discussions to, their respective corporate family and United States subsidiaries. In fact, Chinese-based parents and affiliates often provided pricing instructions to their United States subsidiaries, which acted as their distribution and sales arms in the United States.

> **5.      The Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family**

55.     In meetings and discussions between the Defendants and Co-Conspirators in furtherance of the telescope conspiracy (*see infra*), Plaintiffs allege generally which corporate family was represented in a particular meeting or communications. This is because the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "Synta," "Celestron," "Sunny," or "Meade." Indeed, the officers from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective United States' subsidiaries. Further, because of their generic uses of the Defendants and Co-Conspirators' names, individual participants in the conspiratorial meetings and

discussions did not always know the specific corporate affiliation of their counterparts nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and United States affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

56.    For example, in an email from Peter Ni to Celestron's former CEO Dave Anderson and Celestron's Board members Laurence Huen, Mr. Chen and Sylvia Shen, Mr. Ni wrote "But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY" and "[a]t present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny." *See infra* at section IV.H., ¶ 91.

57.    Similarly, Meade's then Vice-President of Sales Victor Aniceto wrote to then-Meade CEO Defendant Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business." *See infra* at section IV.H., ¶ 99.

58.    Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email to Sunny Optics and Meade, "On the other hand if we take advantage of the strong relationships among Sunny, Synta, Celestron and Meade (under Peter's ownership) ***we can quickly turn the company around and the four companies can dominate the telescope industry***" (emphasis added).

59.    Further revealing the interrelatedness of the Sunny corporate family is the manner in which invoices were paid. For example, Sunny Optical's financial statements reflect Meade paying invoices issued by Sheppard, Mullin, Richter, & Hampton, LLP, the law firm which represented Sunny in the acquisition of Meade.

60.    Further, the Defendants and Co-Conspirators knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, the Defendants and Co-Conspirators would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

**6.      The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms**

61.      The Defendants and Co-conspirators' United States subsidiaries are wholly-owned and/or controlled by their foreign parents or affiliates. As part of each Defendant's global enterprise, its United States subsidiary or affiliate assists the foreign parent or affiliate with the distribution and/or sale of telescopes to consumers in the United States. In most cases, the United States subsidiaries carry out the distribution and/or sales of telescopes to customers in the United States after obtaining products manufactured at the foreign parent or affiliate's factories located abroad. Generally, United States' subsidiaries facilitate direct purchaser orders for telescopes with parents or affiliates overseas. That is, the foreign parent or affiliate manufactures telescopes abroad and sends the telescopes directly to the United States, often through its United States (or other North American) subsidiaries or affiliates. Indeed, the foreign parents and affiliates make millions—if not, billions—of dollars of "sales" annually to their United States' (and other North American) subsidiaries and affiliates as part of their global business.

62.      In sum, the foreign-based Defendants and Co-Conspirators sell directly to the United States and operates their telescope business as a single global enterprise with their subsidiaries and affiliates in the United States and North America generally.

## IV.   FACTUAL ALLEGATIONS

### A.      Consumer Telescopes



*Source:* https://particle.scitech.org.au/space/best-telescope-buy/

63.     Humans have looked up at the heavens and wondered what is out there for millennia. Thousands of amateur astronomers grab their telescope and aim it towards the open sky each day. There is never a shortage of interesting sights in the vast universe. For example, despite the fact that it is only a mere blip on the cosmic scale, the Milky Way galaxy contains over 100 billion stars, and one can uncover the tiny details and see what the naked eye cannot with the help of a telescope.

64.     A telescope is an optical instrument that magnifies and enhances the view of faraway objects. Most telescopes available for purchase to consumers fall into one of two main categories, refractor or reflector, though a combination of the two, Schmidt-Cassegrain telescopes, are also available.

65.     A refractor telescope contains convex (bending outwards) lenses to collect, focus, and magnify light. Rays of light travel through the objective (main) lens where they are focused at the focal length of the eyepiece.

66.     In contrast, a reflector telescope, contains concave (bending inwards like a cave) mirrors. Light travels down the tube where it is reflected (hence the name reflector) up to a secondary mirror near the top of the tube, which directs the light into the eyepiece. This exact system is known as a Newtonian reflector. There are quite a few variations on this, including the Georgian and Cassegrain reflectors.

67.     The Schmidt-Cassegrain telescope has gained immense popularity over the last 30 years. This type of telescope uses both lenses and mirrors in a compound system.

**B.     The Consumer Telescope Markets**

68.     The global market for consumer telescopes is $250 million to $500 million annually. Consumer telescopes do not include advanced telescopes that are found at observatories and universities. The United States is the largest or one of the largest markets for consumer telescopes. Within the consumer telescope market, there are two relevant markets.

**1.     The Manufacturing Market**

69.     The first is for manufacturing consumer telescopes and telescope accessories for import into the United States. The geographic scope of this market is global. Sunny and Synta

together have 80 percent of that market.

70.     Although Sunny and Synta are each capable of manufacturing all types of consumer telescopes, Sunny and Synta have an illegal agreement or understanding that Synta manufactures higher-end products, while Sunny manufactures lower-end products. Pursuant to that unlawful agreement or understanding, Synta will not manufacture or respond to a request for quotation ("RFQ") for products offered by Sunny, and *vice versa*. As a result of their understanding, Sunny and Synta can and do charge supracompetitive prices, restrict supply, and engage in other anticompetitive conduct that artificially increases the prices of the telescopes purchased by American consumers from the Defendants and their subsidiaries.

### 2.     The Distribution Market

71.     The second relevant market is a distribution market downstream from the aforementioned manufacturing market. The geographic scope of this market is the United States. Sunny and Synta collectively dominate the consumer telescope market in the United States by manufacturing, marketing, and/or selling over 80 percent of consumer telescopes in the United States.

72.     In 2005, Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant telescope distributor in the United States though the Defendants and Co-Conspirators' efforts. Subsequently, Sunny acquired Meade with Synta's help and assistance. Synta and Sunny manufacture, market, and/or sell their telescopes to distributors, including their respective wholly owned subsidiaries Celestron and Meade, which then sell the telescopes online, in stores, and through dealers to astronomy enthusiasts in the United States. Celestron and Meade collectively account for the vast majority of consumer telescopes sold in the United States.

### C.     The Defendants Are Liable for the Anticompetitive Conduct Alleged Herein

73.     The jury in the *Orion Litigation* reached various findings of antitrust liability by defendants. As mentioned, *supra*, Orion won a $16.8 million jury verdict against Ningbo Sunny and its subsidiaries, which was statutorily trebled under 15 U.S.C. § 15(a) to $50.4 million. Orion's claims withstood motions to dismiss and summary judgment before proceeding to trial in November 2019.

74.     In the *Orion Litigation*, the jury unanimously found, *inter alia*:

    a.    The defendants agreed with their competitors to fix the price and credit terms for telescopes and accessories in violation of Section 1 of the Sherman Act;

    b.    The defendants agreed with a third party, other than a competitor, to fix the price or credit terms for telescopes and accessories in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

    c.    The defendants agreed with a competitor or potential competitor either (a) not to compete with each other in the manufacture or sale of telescopes and accessories, or (b) to divide customers or potential customers between them, in violation of Section 1 of the Sherman Act;

    d.    The defendants agreed with a third party, other than a competitor or potential competitor, either (a) not to complete with each other in the manufacture or sale of telescopes and accessories, or (b) to divide customers or potential customers between them in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

    e.    The defendants engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act;

    f.    The defendants had a specific intent to achieve monopoly power in the telescope manufacturing market in violation of Section 2 of the Sherman Act;

    g.    There is or was a dangerous probability that the defendants could achieve monopoly power in violation of Section 2 of the Sherman Act;

    h.    The defendants knowingly entered into an agreement with another person or entity to obtain or maintain monopoly power in the telescope manufacturing market in violation of Section 2 of the Sherman Act;

**CLASS ACTION COMPLAINT**                                              18

i.      The defendants specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the telescope manufacturing market in violation of Section 2 of the Sherman Act;

j.      The defendants committed an overt act in furtherance of the conspiracy in violation of Section 2 of the Sherman Act; and

k.      Co-Conspirators Ningbo Sunny and Sunny Optical's acquisition of Co-Conspirator Meade created a reasonable likelihood of substantially lessening competition or creating a monopoly in the telescope manufacturing market in violation of Section 7 of the Clayton Act.

*See* Verdict Form, *Orion Litigation* (Nov. 26, 2019), ECF No. 501.

75.     The defendants' antitrust liability has therefore unquestionably been proven by a preponderance of the evidence. The jury verdict against the defendants in the previous action is as valid as a guilty plea.

**D.      The Federal Trade Commission's Actions in the Consumer Telescope Market**

76.     Antitrust concerns in the consumer telescope market are not new; indeed, they arose in 2005, when Synta acquired Celestron, the largest distributor of telescopes in the United States at the time and a rival of Meade, another consumer telescope distributor. In May 2002, Meade had itself attempted to acquire Celestron. The parties abandoned the deal, however, after the Federal Trade Commission ("FTC") authorized staff to seek a temporary restraining order and a preliminary injunction in federal district court to stop any attempt by Meade, the leading manufacturer of performance telescopes and Schmidt-Cassegrain telescopes in the United States, to purchase all, or certain assets, of Tasco Holdings, Inc.'s Celestron International, the number two performance telescope provider in the United States and the only other supplier of Schmidt-Cassegrain telescopes. According to the FTC's complaint, Meade's acquisition of Celestron assets would adversely impact the performance telescope market by eliminating substantial actual competition between the two companies and by creating a monopoly in the market for telescopes.[1]

---

[1] "FTC Authorizes Injunction to Pre-empt Meade Instruments' Purchase of All, or Certain Assets, of Tasco Holdings, Inc.'s Celestron International," Fed. Trade Comm'n (May 29, 2002), *available*

77.     Similarly, in 1991, the FTC gave final approval to a consent agreement settling charges that a proposed joint venture between Meade and Celestron would have created a virtual monopoly in the manufacture and sale of certain telescopes. The agreement placed a 10-year requirement on Harbour Group Investments, L.P. and Diethelm Holding Ltd. (the former parents of Meade and Celestron, respectively) to obtain FTC approval before acquiring any company that manufactures or sells certain telescopes in the United States. This consent agreement followed a decision by the U.S. District Court for the District of Columbia granting the FTC's motion for a preliminary injunction barring the acquisition of any assets or other interest in Celestron International by Harbour Group Meade's parent) and further barring Diethelm (Celestron's parent) from acquiring any assets or other interest in Meade.[2]

**E.     The Defendants and Co-Conspirators Monopolized Different Products in the Consumer Telescope Market**

78.     Through their unlawful agreements with horizontal competitors, Synta and Sunny effectively divided the consumer telescope market. As alleged above, Synta and Sunny agreed that Synta would manufacture higher-end products and Sunny would manufacture lower-end products. They also agreed that Synta would not manufacturer or respond to an RFQ for products manufactured by Sunny and *vice versa*. Both adhered to their agreements. As a result of their respective market shares, agreements not to compete, and significant barriers to entry (*see infra*), Synta and Sunny both have, and have maintained, an effective monopoly over the respective products that each sell. Sunny and Synta therefore can and do limit supply, charge supracompetitive prices, and engage in other anticompetitive conduct that artificially increases the prices of the telescopes that they respectively manufacture, market, and/or sell.

**F.     The Defendants and Co-Conspirators Colluded on Sunny's Acquisition of Meade**

79.     Meade was the leading American telescope manufacturer and supplier for many years. It owned critical patents, had a manufacturing facility in Mexico, and manufactured high-

---

*at*   https://www.ftc.gov/news-events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-meade-instruments-purchase-all

[2] *FTC v. Harbour Group Investments*, 1990 US Dist. LEXIS 15542 (D.D.C. 1990)

and low-end telescopes. One of the patents was for GoTo technology, a highly valued type of telescope mount and related software that can automatically point a telescope at astronomical objects that the user selects. GoTo technology was also the subject of extensive litigation between Meade and Celestron.

80.     When Meade was offered for sale in 2013, Jinghua Optical Co. Ltd. ("Jinghua"), a small telescope manufacturer and competitor of Sunny and Synta, made a bid to purchase it. If Jinghua had been able to purchase Meade, it would have gained critical knowledge about the manufacture of high-end telescopes and accessories as well as Meade's patent portfolio, permitting it to better compete with Sunny and Synta in both the manufacturing and distribution markets.

81.     Sunny and Synta colluded to prevent Jinghua's acquisition of Meade, which would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry. Sunny and Synta were motivated to scupper the Jinghua deal and to conspire because the FTC had blocked Meade and Celestron's merger in 1991 and 2002. Additionally, Synta could not acquire Meade due to its ownership of Celestron. As a result, Sunny's Mr. Ni and Synta's Mr. Chen agreed that if Sunny moved to acquire Meade, Celestron and Synta would provide financial and other assistance to complete the acquisition. This is not the kind of arrangement into which true competitors enter.

82.     Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. These payments were documented, for example, in an accounting provided by Celestron's CFO, Paul Roth. As part of this unlawful agreement, Celestron took equity in Meade, which is memorialized in shadow books kept by Defendants and Co-Conspirators.

83.     On information and belief, in exchange for this support, Sunny concealed Synta's and Celestron's involvement or assistance in its acquisition of Meade from the FTC; Sunny offered Celestron equity in Meade; Sunny provided Celestron and Synta with access to Meade's intellectual property rights, thereby ensuring that Celestron no longer needed to compete with Meade (previously an independent company); and Sunny shared its customers' data—including pricing data—with Celestron and Synta, thus enabling them to coordinate their prices and

strategies. This cooperation reinforced Synta and Sunny's respective monopoly in the United States for their products.

84.     Synta and Sunny's combination and conspiracy eliminated a competitor (Meade), increased market concentration, and solidified their monopoly power. Specifically, the effect of Sunny's acquisition of Meade lessened competition, raised the already-high barriers to entry (*see infra*), and tended to create monopolies for Synta and Sunny's in the United States.

85.     After the Meade acquisition, Co-Conspirators Shen and Huen continued to provide advice and assistance to horizontal competitors Ningbo Sunny and Meade, met with Mr. Ni about these issues, and toured Meade's facilities. Mr. Huen also instructed Ningbo Sunny to remove Meade's CEO and to replace him with Celestron's former CEO, Mr. Lupica.

**G.     The Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets**

86.     Synta and Sunny colluded to prevent Orion from acquiring various valuable assets. In 2014, Orion attempted to acquire certain assets, including web domains like telescopes.com, from online retailer, Hayneedle ("Hayneedle Assets"). The Defendants and Co-Conspirators used their market power to fix credit terms to prevent Orion from acquiring the Hayneedle Assets. Specifically, they cut off Orion's credit when they learned that Orion sought to acquire these assets.

87.     On May 12, 2014, Orion sent a letter of intent to Hayneedle indicating that Orion sought to purchase the Hayneedle Assets. On June 14, 2014, Synta sent Orion's CEO, Peter Moreo, an email that ended Orion's credit, stating, "if Orion really buys Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more." Synta then forwarded this email to Sunny and requested that Sunny also withdraw Orion's line of credit. Sunny then sent Orion an email nearly identical to Synta's email. With its supplier credit cut off, Orion could not move forward with the asset acquisition. Synta and Sunny therefore sabotaged Orion's purchase of the Hayneedle Assets that would have allowed it to better compete with them.

**H.     Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices**

88.     In the *Orion Litigation*, evidence demonstrated that the defendants fixed the prices

for consumer telescopes, allocated the market thereof, illegally acquired assets, and unlawfully monopolized, and/or attempted to monopolize, the telescope supply and distribution markets. They also used cooperation and dominance in the consumer telescope manufacturing market to facilitate their syndicate of companies' takeover of the distribution market. The defendants' anticompetitive conduct includes, without limitation:

    a.    Fixing the prices of consumer telescopes;

    b.    Allocating the market for consumer telescopes;

    c.    Jointing working together, and aiding and abetting Sunny's acquisition of Celestron's horizontal competitor, Meade;

    d.    Exchanging non-public, material information with each other, including Meade's intellectual property, business plans, and product pricing strategies;

    e.    Exchanging non-public, material information about competitors' businesses, including intellectual property, business plans, and product pricing strategies; and

    f.    Aiding and abetting each other's consolidation and maintenance of monopoly power.

89.    Through these activities, the Sunny and Synta corporate families illegally combined and conspired with each other instead of competing against one another and enabled Celestron to dominate the consumer telescope distribution market. Celestron has amassed at least 70 percent of the consumer telescope market in the United States as a result of the Defendants and Co-Conspirators' anticompetitive conduct.

90.    Illustrative examples of the Defendants and Co-Conspirators' conspiratorial conduct in the consumer telescope manufacturing and distribution markets include, but are not limited to:

91.    Regarding the horizontal competitors' conspiracy to acquire Meade for Sunny, Sunny's Mr. Ni confirmed to Celestron's then-CEO David Anderson and directors, David Shen, Laurence Huen, Jack Chen, and Sylvia Shen, that Sunny would purchase Meade to prevent JOC (Jinghua) from doing so per the parties' discussion and indicated that Celestron and Synta should

1  provide the financial support to Sunny.

| From: | nbsunny <nbsunny@vip.sina.com> |
|---|---|
| Sent: | Friday, December 13, 2013 12:43 AM |
| To: | DAVE ANDERSON |
| Cc: | david shen; Laurence Huen; Jack chen; shentakuo1 |
| Subject: | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

At present, Sunny has already paid more than $10 millions to MEADE. According to your email, you said you will not provide the financial support to sunny in 2014. It will not maintain MEADE's operation, if only support them by sunny. We had borrowed a lot of money from bank for MEADE. Moreover, Meade still needs to addition $3.5 millions working capital to support their normal operation work at the first of 2014.

As your mention, the $10 millions that you support us is included the payment of goods that the terms of payment is 100days. But so far, CELESTRON is total paid $4.5 millions if we calculated based on the term of payment is 100 days.

In 2014, we hope the term of payment that CELESTRON pay to sunny will less than 50 days form shipping. And maybe you can pay the SYNTA later; I think Mr. Shen will agree it. At present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny. I think it will help to cushion MEADE if Meade get this money from bank.

Best regards,

Ni Wen Jun

92.   In the *Orion Litigation,* the jury found that Sunny and Synta conspired to acquire Meade. Synta made substantial payments and loans to Sunny to facilitate the Meade acquisition. Celestron took equity in its competitor, Meade, as part of this unlawful arrangement between Sunny and Synta.

93.   Additionally, Sheppard, Mullin, Richter, & Hampton, LLP ("Sheppard Mullin") represented Sunny in the acquisition of Meade. According to the engagement letter, however, Sheppard Mullin was required to take instructions from Synta's Mr. Shen and his executives, including Celestron's Joe Lupica and Dave Anderson. Messrs. Lupica and Anderson helped Sheppard Mullin negotiate and structure the transaction and instructed it to keep Messrs. Shen and Ni updated. This is not the kind of arrangement that would occur amongst normal horizontal competitors.

**CLASS ACTION COMPLAINT**                                    24

1.   Scope of Representation.  Except as we may agree otherwise in writing, we will be representing only the Client and will not be representing any parent, subsidiary or other affiliated entity nor any shareholder, partner, member, director, officer, employee, agent or insurer of the Client.  Except as we may otherwise agree, the terms of this letter apply to other

engagements for the Client that we may undertake.  You have advised us that you will obtain tax advice regarding the Matter from a third party; accordingly, our firm will not be providing any tax advice in connection with the Matter, including, without limitation, tax structuring or tax consequences arising out of the Matter.  You have instructed us to take direction from and communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica.

94.     Sunny's Mr. Ni and Synta's Mr. Shen also agreed that Celestron's then-CEO, Mr. Lupica, would be transferred to Sunny, and after Sunny's acquisition of Meade, Mr. Lupica would become Meade's CEO. He and others acted as a conduit of information between Sunny and Synta.

95.     When the FTC inquired into whether Synta's Mr. Shen was involved in any way in Sunny's Meade acquisition, Sheppard Mullin partner Robert Magelnicki represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade" on August 22, 2013. This statement was false given that Sunny's Mr. Ni and Synta's Mr. Shen agreed before this that Mr. Shen and his companies would provide financial support to Sunny in connection with the Meade acquisition.

96.     The FTC was also concerned that Synta's Mr. Shen was previously a Ningbo Sunny shareholder. To allay the FTC's concerns, Ningbo Sunny's Mr. Ni formed Sunny Optics, Inc., the entity used to acquire Meade and became its sole shareholder. Sheppard Mullin then represented to the FTC that Ningbo Sunny had nothing to do with the Meade acquisition. Then, after the acquisition closed, Mr. Ni transferred his interest in Sunny Optics to Ningbo Sunny for a nominal amount of $1.

97.     After Sunny acquired Meade, Sunny and Synta agreed not to compete with each other, which was the entire purpose of this charade from the beginning. For example, a December 12, 2013 email thread between the entities reflects a request from Synta's Mr. Shen to Sunny's Mr. Ni to reach an understanding with Celestron's then-CEO about not competing against Celestron for sales:

- Bidding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This needs Director Ni to communicate face-to-face with DAVE when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? All products are produced by sunny. Following a conflict, celestron would not trust sunny any longer.
- Going back to the risk arising out of forwarding SYNTA's order to Boguan Jinghua 8 years ago, it maybe not happen. But they would think that there is no value to fight for the Company. Most of CELESTRONs senior executives left because they are Americans who live for their dreams.
- we recommend that Director Ni personally take the two actions concurrently, by selling the products to outside China and the United States, or meet with CELESTRON DAVE to resolve difficulties and make every effort to get order from COSTCO.
- it is worth it to affect the whole thing and personal communication is more important.

98.    In a June 13, 2014 email, Synta's Mr. Shen informed Sunny's Mr. Ni and Celestron's Mr. Anderson, "The best way in the future is to divide the products and sell them into different markets to reduce conflicts":

-------- 转发邮件信息 --------

Forwarded email

发件人: "david shen" <syntadavid@163.com>

发送日期: 2014-06-13 07:04:18

收件人: "Laurence Huen" <vancouver_blue_junior@yahoo.com>,DAVE <danderson@celestron.com>,sylvia <shentakuo@gmail.com>

主题: Re:Laurence 回 复關於David 電話 re:Hayneedle

Re: Laurence's reply about David's phone

Laurence & Dave

感 谢 您 的 回 复，由于收到您的信晚了，再加上沒 有 Dave指導性 內容,我 也 無 法 向 peter致信

Thank you for your reply. Since it was late when I received your letter, and I was not given with Dave's guiding information, I was therefore unable to write to Peter. Letters communicated to and from me and Peter should be brief and to the point, so I need to wait for Dave's comments for reference before sending it out.

The materials provided by Dave today are extremely important for reference. Meanwhile, my worries concerning the issue have been also reduced greatly. Since most of Telescope's business comes from Celestron, Celestron deems purchase of Hayneedle by Orion is positive at some points (the positive is more than the negative). But rising of the sales website may harm the business of the other traditional fields. The best way in the future is to divide the products and sell them into different markets to reduce conflicts.

Following purchase of Hayneedle by Orion, what makes it more concerned about is its ability to pay products payable. I suggest that Dave may propose to Orion that if business is continued, we need to know the financial condition of investors behind imaginova. If the fund is the cash increased by the company, then it would be safe. If the fund is borrowed,causing worse situation considering the current heavy debt, we need to deal with it carefully.

Viewing its current suppliers, JOC/GSO/BOSMA/IOPTRON.... no company can replace CELESTRON.... SKYWATCHER...MEADE...

If we don't supply products, Hayneedle invested by Orion with $4.5 million would immediately value at less than $2 million. This is my opinion.

99.    Defendants and Co-Conspirators' objective was to ensure that Celestron was able to dominate the consumer telescope market in the United States. To do so, Sunny (and, as a consequence, Meade) agreed not to compete against Celestron. As Meade's then-Vice President of Sales, Victor Aniceto, explained the strategy to Meade's then-CEO Mr. Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business."

**From:** "Victor Aniceto" <victor.aniceto@meade.com>
**Date:** November 12, 2013 at 4:54:52 PM PST
**To:** "Joe Lupica" <joe.lupica@meade.com>
**Subject:** proposed promo

Joe,
We met earlier today to discuss promotional activities to generate revenue and kick start our holiday activities.

Attached is a P & L with background on YTD sales on products we currently have instock.

For the LX850, we discussed $1000 off on the mount only. This will result in a retail price of $4999. Comparably, CGE Pro mounts have a special price of $3999 ($1,000 off). We will still be higher by $1,000 but we have Starlock. This is designed to get interest going on this mount as well as take advantage of the great review in S & T.

For the PST, we will offer $100 off which will be competitive against the Lunt offers.
The SMT90-15 needs a boost as we have only sold 3 all year that is why we are aggressive but we will still have good margins.

Lastly, the XWA eyepieces are really under performing and we just need to move the inventory out.

Mr Ni discussed with me earlier that he wants us to remain profitable and he doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business.

We plan to launch this at ASAE and sent to the dealers by Saturday, 11/16/13.

Please provide your approval.

Thanks.

**Victor Aniceto**
Vice President of Sales
Meade Instruments Corp.
victor.aniceto@meade.com
Tel - 949.451.1450, ext. 6364
Fax - 949.451.1460   www.meade.com

100.   In addition to the foregoing, Celestron's current CEO, Corey Lee, conspired with Synta and Sunny to steal competitors' key business information. Sunny sells products to Celestron's competitors. Sunny provides Celestron with material business information on such customers, including its pricing of products, credit arrangements, and order forecasts. For instance, Sunny's James Chiu provided detailed data for several recent years of Irion orders to Celestron's CEO, Mr. Lee:

From: nbsunny [mailto:nbsunny@vip.sina.com]
Sent: Friday, May 22, 2015 4:58 PM
To: COREY LEE
Subject: 回复: RE: orion 订单统计    Re: Order statistics

Dear Corey,

This is for 2014. I will send for 2013 on Monday.

Junwen

发件人：COREY LEE
发送时间：2015-05-23 06:31
收件人：nbsunny
主题：RE: Re: orion 订单统计    Subject: Re: Order statistics

Junwen,

Thank you.  I assume this information is for Orion orders in 2015?  Can you supply sales figures for both 2014 and 2013?

Thank you.

Corey

101.    Sunny and Synta also exchanged and fixed prices. They discussed and agreed on the amount to charge distributors. For example, Sunny's James Chiu and Synta's Joyce Huang discussed Sunny's prices and determined they should be higher. Similarly, Ms. Huang informed Mr. Chiu that Sunny's "payment terms should be the same with Suzhou [Synta.]"

102.    In addition to the foregoing, the Defendants and Co-Conspirators' emails reveal their market allocation agreement. For example, Sunny's Vice Chairman, Mr. Chiu, wrote to Sylvia Shen to discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron."

103.    Sunny's Mr. Chiu also explained to Synta's Sylvia Shen that Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers."

104.    In sum, as Synta's Mr. Shen explained in an email to Sunny: "Director Ni will not

**CLASS ACTION COMPLAINT**                                                                                    28

be a competitor and is trustworthy when it comes to business."

105.   The Defendants and Co-Conspirators coordinated and raised their prices as a result of their *per se* illegal agreements and understandings. They sought to avoid competition with each other's products and developed strategies to protect each other from further competition. Mr. Lupica wrote, they did this to collectively "dominate the telescope industry."

106.   As Synta's Mr. Shen explained to Sunny, "we do not need to wage a price war[.]"

**I.    The Structure and Characteristics of the Consumer Telescope Market Render the Conspiracy More Plausible**

107.   The consumer telescope manufacturing and distribution markets are conducive to a price-fixing agreement because of their structure and other characteristics, which have made collusion particularly attractive in these markets. Specifically, these markets: (1) have high barriers to entry; (2) are highly concentrated; and (3) have inelastic demand.

**1.    The Consumer Telescope Manufacturing and Distribution Markets Have High Barriers to Entry**

108.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

109.   There are substantial barriers that preclude, reduce, or make more difficult entry into the telescope manufacturing and distribution markets. A new entrant into the business would face costly and lengthy start-up costs, including multi-million-dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

110.   The high barriers to entry allow the Defendants and Co-Conspirators to control prices and output for several reasons. First, manufacturing telescopes requires high capital investments, and Sunny and Synta are vertically integrated with the largest distributors. There is an insufficient number of independent distributors to render independent manufacturing

profitable. Second, manufacturing telescopes requires key intellectual property rights, such as patents on software to automatically detect celestial objects demanded by amateur astronomers. Meade invented this software and initially owned the patents. The Defendants and Co-Conspirators colluded, however, so that Sunny could acquire Meade, thereby blocking independent manufacturers that might have been able to successfully compete with Sunny or Synta with this game-changing intellectual property.

111. As evidence of the high barriers to entry, no new, significant consumer telescope manufacturers have entered the market in at least a decade. Furthermore, in light of Sunny's acquisition of Meade, which also had manufacturing capabilities, in 2013, the number of suppliers has essentially dwindled to Sunny and Synta.

112. Furthermore, Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrate that the barriers to entry into the supply market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition at the supply level.

### 2. The Consumer Telescope Manufacturing and Distribution Markets Are Highly Concentrated

113. A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

114. The Defendants and Co-Conspirators dominate both the consumer telescope manufacturing market globally and distribution market in the United States. As mentioned above, the Defendants and Co-Conspirators have 80 percent of the former and over 80 percent of the latter.

115. The consumer telescope manufacturing market was not always highly concentrated. Sunny and Synta transformed this market, however, by colluding to prevent competitors from entering the market and thereby making sure they are the only viable sources of consumer telescopes.

116. Sunny and Synta also conspired to leverage their collective market power in consumer telescope manufacturing to control consumer telescope distribution. Consequently,

Synta's Celestron rose to prominence over other distributors. Additionally, when Sunny acquired Meade with the help of Synta, Defendants and Co-Conspirators removed a competitor and independent supplier from the distribution market—Meade. Neither Celestron nor Meade have seriously competed since Sunny's acquisition of Meade or exercised their manufacturing capabilities to diversify the supply of consumer telescopes.

117.   Furthermore, Sunny and Synta consolidated control of the distribution market by fixing prices and engaging in anticompetitive conduct. Specifically, Synta and Sunny would offer supply to Celestron at prices far below, and with credit terms far better, than those offered to distributors outside of their syndicate of companies, thereby raising consumer telescope prices in the distribution market. With no other meaningful sources of supply, Plaintiffs and the Classes had no choice but to pay the supracompetitive prices caused by the Defendants and Co-Conspirators' unlawful conduct.

### 3.      There is Inelasticity of Demand for Consumer Telescopes

118.   "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

119.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

120.   Demand for consumer telescopes is highly inelastic because there are no close substitutes for these products.

## V.      CLASS ACTION ALLEGATIONS

121.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive

relief on behalf of the following classes ("Nationwide Injunctive Class") under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2):

> All persons and entities who indirectly purchased a telescope for their own use and not for resale during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

122.   Plaintiffs also bring this action on behalf of themselves and as a nationwide class of Indirect Purchaser States under Rule 23(a) and (b)(2), seeking damages pursuant to California state antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the following class ("Damages Class"):

> All persons and entities who indirectly purchased a telescope for their own use and not for resale in one of the Indirect Purchaser States during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

123.   The "Indirect Purchaser States," for purposes of this complaint, are: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**A.    California Law Should Be Applied to the Nationwide Indirect Purchaser States' Damages Class**

124.   It is appropriate to apply California law to a class of indirect purchaser plaintiffs from the Indirect Purchaser States because many of the Defendants and Co-Conspirators and their respective subsidiaries and affiliates can be found in California and have their principal place of business in California; many of the key witnesses reside in California; the Defendants and Co-Conspirators carried out their conspiracy in California, *inter alia*, by coordinating it through the California offices of Sunny's legal counsel, Sheppard Mullin; and much of the Defendants and Co-Conspirators' sales occurred in California. California law should be applied to the Damages Class for the following reasons:

### 1. The Conspiracy Emanated from California: Location of Defendants and Co-Conspirators

125. Aside from the foreign entities, the most critical corporate entities furthering the conspiracy alleged herein were incorporated in or carried out their principal place of business in California.

126. Defendant Celestron—a major participant in the conspiracy— is headquartered and has its principal place of business in Torrance, California. Acts in furtherance of the conspiracy by Celestron were carried out in California.

127. Defendant Sky-Watcher USA is headquartered and has its principal place of business in Southern California.

128. Co-Conspirator Meade—a major participant in the conspiracy, which would have been named as a Defendant but for its bankruptcy petition— is headquartered in Irvine, California. Acts in furtherance of the conspiracy by Meade were carried out in California.

129. According to an April 11, 2014 email from Mr. Lupica, when Sunny acquired Meade in 2013, Meade had over 10 legal entities formed in California that were paying state taxes each year, including Meade Instruments Holding Corp., Meade Coronado Holding Corp., MTSC Holding Corp., MC Holding Corp., Meade Instruments Europe Corp., Meade.com, and Coronado Instruments Inc., among others.

### 2. The Conspiracy Emanated from California: Location of Individuals

130. David Shen regularly comes to this District and other places in the U.S. to meet with United States distributors of Synta products. Acts in furtherance of the conspiracy by David Shen were carried out in California.

131. Joe Lupica, Celestron's former CEO and then Meade's former CEO, resides in California. Acts in furtherance of the conspiracy by Joe Lupica were carried out in California.

132. Corey Lee, Celestron's CEO, resides in California. Acts in furtherance of the conspiracy by Corey Lee were carried out in California.

### 3. Specific Targets of the Conspiracy Were from California

133. A unanimous jury has already found that Orion, an American retail company that

sells telescopes, was harmed by the conspiracy alleged herein.

134.   Orion, which competes with Synta and Sunny both in the manufacture and distribution of telescopes and filed a complaint against them in the *Orion Litigation*, has corporate offices in Watsonville, California and a retail store in Cupertino, California.

### 4.   The Conspiracy Emanated from California: Sheppard Mullin Facilitated the Conspiracy from California

135.   The persons at the law firm of Sheppard Mullin who helped facilitate the conspiracy, did so from California. For example, a June 6, 2013 engagement letter with Sunny in connection with Sunny's acquisition of Meade specifies that "this agreement will be governed by the laws of California without regard to its conflict rules."

136.   Will S. Chuchawat, the Sheppard Mullin attorney who wrote the aforementioned engagement letter, is based in California. On information and belief, he accepted instruction from both Sunny and Synta on structuring and negotiating Sunny's acquisition of Meade and handled the acquisition from California

137.   Jason Schendel, another Sheppard Mullin attorney, who worked on the deal process, is also based in California. On information and information, he accepted instruction from both Sunny and Synta on structuring and negotiating Sunny's acquisition of Meade and handled the acquisition from the Bay Area. Indeed, a July 16, 2013 email from him to Celestron's then-CEO Mr. Lupica and Celestron's board member Mr. Huen regarding next steps in Sunny's acquisition of Meade confirms as much.

### 5.   The Defendants and Co-Conspirators Targeted California

138.   The Defendants and Co-Conspirators directed their conduct at persons and activities within California. For example, Synta manufactures a large proportion of productions for California-based Orion under the Orion brand name.

139.   There are at least 73 amateur astronomy clubs in California that feature meetings, viewing nights, star parties, and stargazing programs which, on information and belief, is more than any other state.

140.   Defendants have violated California antitrust and consumer protection laws, and

California has an interest in not only protecting its own consumers but in punishing businesses like Defendants that operate within its borders.

**B.** **Alternatively, Plaintiffs Will Seek to Certify State Damages Classes**

141. As an alternative to the Damages Class, in the event California law is not applied to class members' claims residing in states that recognize a form of indirect purchaser cause of action, Plaintiffs will seek certification of classes asserting claims of damages under the antitrust statutes and/or consumer protection statutes of the following Indirect Purchaser States (collectively, the "State Damages Classes"):

**Arizona:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arizona during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Arkansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arkansas during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**California:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in California during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Connecticut:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Connecticut during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**District of Columbia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in the District of Columbia during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Florida:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Florida during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Hawaii:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Hawaii during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Illinois:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Illinois during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or

Co-Conspirators, or any current or former affiliate thereof.

**Iowa:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Iowa during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Kansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Kansas during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Maine:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Maine during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Massachusetts:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Massachusetts during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Michigan:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Michigan during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Minnesota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Minnesota during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Mississippi:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Mississippi during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Missouri:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Missouri during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Montana:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Montana during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nebraska:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nebraska during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nevada:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nevada during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants

or Co-Conspirators, or any current or former affiliate thereof.

**New Hampshire:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Hampshire during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Mexico:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Mexico during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New York:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New York during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Carolina during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Dakota during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Oregon:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Oregon during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Rhode Island:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Rhode Island during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Carolina during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Dakota during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Tennessee:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Tennessee during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Utah:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Utah during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-

Conspirators, or any current or former affiliate thereof.

**Vermont:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Vermont during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**West Virginia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in West Virginia during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Wisconsin:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Wisconsin during the period from and including January 1, 2005 through August 31, 2019 that was manufactured or sold by the Defendants or Co-Conspirators, or any current or former affiliate thereof.

142.   The Nationwide Injunctive Class, Damages Class, and the State Damages Classes are referred to herein as the "Classes" unless otherwise indicated. Excluded from the Classes are the Defendants and Co-Conspirators, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased telescopes directly. Plaintiffs reserve the right to amend the aforementioned definitions if discovery and further investigation reveal that they should be expanded or otherwise modified.

143.   Plaintiffs properly bring this action as a class action under Rule 23(a) for the following reasons:

    a.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The Classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. While Plaintiffs does not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are tens of thousands of members in each Class. The precise number of Class Members can be ascertained through discovery;

    b.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the Classes which predominate over any questions that may affect particular Class Members. This is particularly true given the nature of the Defendants' conspiracy,

which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

i.      Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of telescopes sold in the United States;

ii.     The identity of the participants of the alleged conspiracy;

iii.    The duration of the alleged conspiracy and the acts carried out by the Defendants and their co-conspirators in furtherance of the conspiracy;

iv.     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Cause of Action;

v.      Whether the consumer telescope market is a relevant product market;

vi.     Whether the United States constitutes a relevant geographic market for consumer telescopes;

vii.    Whether Defendants possess market or monopoly power in the consumer telescopes market;

viii.   Whether Defendants and their alleged horizontal competitors agreed or combined to restrain competition and exclude competitors from the consumer telescopes market;

ix.     Whether Defendants entered into concerted refusals to deal to foreclose competition and exclude competitors from the consumer telescopes market;

x.      Whether the alleged monopoly and/or attempt to monopolize violated the Sherman Act, as alleged in the Second and Third Causes of Action;

xi.     Whether the alleged conspiracy, monopoly, and/or attempt to

**CLASS ACTION COMPLAINT**                                                      39

1    monopolize violated state antitrust and/or consumer protection laws,

2    as alleged in the Fifth and Sixth Causes of Action;

3    xii.    Whether the Defendants unjustly enriched themselves to the

4    detriment of the Plaintiffs and the members of the Damages Class,

5    thereby entitling Plaintiffs and the members of the Damages Class to

6    disgorgement of all benefits derived by the Defendants, as alleged in

7    the Sixth Cause of Action;

8    xiii.   Whether the conduct of the Defendants and their co-conspirators, as

9    alleged in this Complaint, caused injury to the property of Plaintiffs

10   and the members of the Classes;

11   xiv.    The effect of the alleged conspiracy on the prices of telescopes sold

12   in the United States during the Class Period;

13   xv.     Whether Plaintiffs and members of the Classes had any reason to

14   know or suspect the conspiracy, or any means to discover the

15   conspiracy;

16   xvi.    Whether the Defendants and their co-conspirators fraudulently

17   concealed the conspiracy's existence from Plaintiffs and the members

18   of the Classes;

19   xvii.   The appropriate injunctive and related equitable relief for the

20   Nationwide Class; and

21   xviii.  The appropriate class-wide measure of damages for the Damages

22   Class.

23   c.      **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the

24   claims of Class Members. Plaintiffs and the Classes have been injured by

25   the same wrongful practices of Defendants. Plaintiff's claims arise from the

26   same practices and conduct that give rise to the claims of the Classes and are

27   based on the same legal theories;

28   d.      **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will

fairly and adequately protect the interests of the Classes in that he has no interests antagonistic to those of the other Class Members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

144. This action is properly brought as a class action under Rule 23(b) for the following reasons:

a. **Class Action Status (Fed. R. Civ. P. 23(b)(1)):** Class action status in this action is warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by Class Members would create a risk of establishing  incompatible standards of conduct for Defendants. Class action status is also warranted under Rule   23(b)(1)(B) because prosecution of separate actions by Class Members would create a   risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

b. **Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)):** Certification under Rule 23(b)(2) is warranted because  Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the  Classes as a whole.

c. **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because  questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available  methods for the fair and efficient adjudication of this controversy.

d. The Classes are ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same fashion;

145.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    a.    Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    b.    This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

    c.    Without a class action, Class Members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

    d.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## VI.   PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

146.   In the consumer telescope manufacturing market, price competition has been restrained or eliminated because Sunny and Synta engaged in price-fixing, agreed to allocate the market among themselves, limit supply, thereby raising consumer prices.

147.   Competition, innovation, and consumer choice have also been restrained due to Ningbo Sunny's acquisition of Meade. Since Ningbo Sunny acquired Meade, Meade has not significantly competed with Celestron. Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, such as Jinghua, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

148.   In the consumer telescope distribution market, price competition has also been restrained or eliminated because Sunny and Synta allocated the market among themselves.

Additionally, by fixing prices and credit terms so that unaffiliated distributors pay more than affiliated distributors, and by sharing independent distributors' confidential business information with each other, Sunny and Synta have prevented independent distributors from fairly competing against their own affiliates and putting downward pressure on prices.

149.  The Defendants' conspiracy had the following effects, among others:

    a.  The number of manufacturers and products for consumer telescopes and accessories have been reduced as a result of Synta's acquisition of Celestron and Sunny's acquisition of Meade;

    b.  There have been no new entrants into the consumer telescope market for a decade and many independent manufacturers and distributors have gone out of business as a result of Synta and Sunny's collusion;

    c.  Price competition has been restrained or eliminated with respect to telescopes;

    d.  The prices of telescopes have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    e.  Indirect purchasers of telescopes have been deprived of free and open competition; and

    f.  Indirect purchasers of telescopes paid artificially inflated prices.

150.  These antitrust injuries are of the type that the antitrust laws were meant to punish and prevent.

151.  On information and belief, Sunny and Synta have collectively controlled at least 65 percent of the global manufacturing market since 2012. This figure increased to over 90 percent in 2012.

152.  During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for telescopes. Telescope distributors and retailers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched the Defendants. Telescopes follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any cost changes attributable to telescopes can be

traced through the chain of distribution to Plaintiffs and the members of the Classes.

153. Just as telescopes can be physically traced through the supply chain, so can their prices be traced to show that changes in the prices paid by direct purchasers affect prices paid by indirect purchasers. Here, the inflated prices of telescopes resulting from the Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by distributors and retailers.

154. The economic and legal literature has recognized that unlawful overcharges in a multiple-level distribution chain normally result in higher prices for those at the bottom of the distribution chain. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[3]

155. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[4]

156. The purpose of the conspiratorial conduct of the Defendants and their co-

---

[3] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

[4] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

conspirators was to raise, fix, rig or stabilize the price of telescopes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of telescopes to distributors and retailers on the price of telescopes to consumers while controlling for the impact of other price-determining factors.

157. The precise amount of the overcharge impacting the prices of telescopes can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

158. By reason of the violations of the antitrust, consumer protection, and unjust enrichment laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their property, having paid higher prices for telescopes than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII. THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S CLAIMS

### A. The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

159. Plaintiffs repeats and re-allege the allegations set forth above. Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 2019, when evidence of Defendants' conspiracy was first made public in the *Orion Litigation*.

160.   Plaintiffs and members of the Classes are consumers that purchased telescopes not for resale. They had no direct contact or interaction with the Defendants and had no means from which they could have discovered the telescopes combination and conspiracy described in this Complaint before September 2019.

161.   No information in the public domain was available to Plaintiffs and members of the Classes concerning the combination or conspiracy alleged herein prior to September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion Litigation*. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants or their co-conspirators' dealings with competitors or direct purchasers, much less the fact that the Defendants and their co-conspirators had engaged in the combination and conspiracy alleged herein.

162.   For these reasons, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run until, at the earliest, September 2019.

**B.     Fraudulent Concealment Tolled the Statute of Limitations**

163.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion Litigation*.

164.   Before that time, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct and did not know before then that they were paying supra-competitive prices for telescopes throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

165.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The following are illustrative examples of Defendants' fraudulent concealment:

166.   Synta and Sunny attempted to conceal the existence of their transactions in connection with Sunny's acquisition of Meade. David Anderson revealed in an email recently disclosed in pending litigation that "Since July Celestron has made $10 million in anticipated payments to Sunny. This represents a majority of the monies that will be paid to Sunny this year. If Celestron continues with this payment pattern it will need to disclose this arrangement to its auditors and its bank. Though we see this as temporary an outside group (such as the bank or auditing firm) will interpret it as a significant change due to the fact that the majority of payments for the last 7 months were made in anticipation with no discernable benefit to Celestron."

167.   Additionally, as stated, *supra*, when the FTC inquired into whether Synta's Mr. Shen was involved in Sunny's Meade acquisition, Sheppard Mullin partner Robert Magelnicki represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade[.]" This statement was false in light of the fact that Sunny's Mr. Ni and Synta's Mr. Shen agreed before this that Mr. Shen and his companies would provide financial support to Sunny in connection with the Meade acquisition.

168.   Furthermore, as part of Synta and Sunny's collusion regarding Meade, Celestron took equity in Meade, which is memorialized in Defendants and Co-Conspirators' shadow books.

169.   In addition to the foregoing acts of fraudulent concealment, by their very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Telescopes are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the consumer telescopes industry to be a competitive industry. On information and belief, the Defendants met and communicated in secret and agreed to keep the facts about its collusive conduct from being discovered by any member of the public or by distributors, retailers, and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' telescope prices before September 2019, at the earliest.

170.   Plaintiffs and the members of the Classes could not have discovered the alleged

contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

171.   Because the alleged conspiracy was self-concealing and affirmatively concealed by the Defendants and its co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until, at the earliest, September 2019 when evidence of Defendants' conspiracy was first made public in the Orion Litigation.

172.   For these reasons, the statute of limitations applicable to Plaintiffs and the Classes' claims was tolled and did not begin to run until September 2019.

## VIII. CAUSES OF ACTION

**First Cause of Action**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Restraint of Trade**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

173.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

174.   The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

175.   The acts done by the Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

176.   During the Class Period, the Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for telescopes, thereby creating anticompetitive effects.

177.   The anticompetitive acts were intentionally directed at the United States market for telescopes and had a substantial and foreseeable effect on interstate commerce by raising and

fixing prices for telescopes throughout the United States.

178.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for telescopes.

179.   As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Injunctive Class who purchased telescopes have been harmed by being forced to pay inflated, supra-competitive prices for telescopes.

180.   In formulating and carrying out the alleged agreement, understanding and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

181.   The Defendants and their co-conspirators' conspiracy had the following effects, among others:

a.     Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the United States;

b.     Prices for telescopes sold by the Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.     Plaintiffs and members of the Nationwide Injunctive Class who purchased telescopes indirectly from the Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

182.   Plaintiffs and members of the Nationwide Injunctive Class have been injured and will continue to be injured in their business and property by paying more for telescopes purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

183.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

184.   Plaintiffs and members of the Nationwide Injunctive Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

**Second Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

185.   Plaintiffs incorporates by reference the allegations in the preceding paragraphs.

186.   The relevant market is the consumer telescope manufacturing market globally and distribution market in the United States.

187.   The Defendants and Co-Conspirators have monopoly power in both the manufacturing market and the distribution market through:

    a.   Synta's acquisition of Celestron in 2005;

    b.   Synta facilitating Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

    c.   Synta and Sunny agreeing to allocating the consumer telescope market such that Synta manufacturers higher-end products and Sunny manufacturers lower-end products;

    d.   Synta and Sunny agreeing to not to bid on RFQs for each other's product offerings;

    e.   Synta and Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

    f.    Synta and Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

188.   The Defendants and Co-Conspirators have willfully acquired or maintained their monopoly in the consumer telescope market through the aforementioned conduct plus:

    a.   Colluding to prevent Jinghua from acquiring Meade;

    b.   Making false representations to the FTC regarding Synta's involvement in Sunny's acquisition of Meade; and

c.      Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

189.   The Defendants' acquisition or maintenance of its monopoly in the consumer telescope market is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

190.   There is no procompetitive justification for the Defendants' anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the consumer telescopes market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

191.   The Defendants' willful acquisition or maintenance of its monopoly in the consumer telescopes market injured, and continues to injure, Plaintiffs and members of the Nationwide Class in their property by:

      a.      Restricting output and limiting consumer choice in the consumer telescope market; and

      b.      Forcing Plaintiffs and members of the Nationwide Class to pay artificially high, supracompetitive prices for telescopes.

192.   The injury to Plaintiffs and members of the Nationwide Class was a foreseeable consequence of the Defendants' willful acquisition or maintenance of its monopoly in the consumer telescope market.

193.   Plaintiffs and members of the Nationwide Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

**Third Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Attempted Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

194.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

195.   The relevant market is the consumer telescope manufacturing market globally and distribution market in the United States.

196.   The Defendants have attempted to monopolize the consumer telescope market

through:

    a.      Synta's acquisition of Celestron in 2005;

    b.      Synta facilitating Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

    c.      Synta and Sunny agreeing to allocating the consumer telescope market such that Synta manufacturers higher-end products and Sunny manufacturers lower-end products;

    d.      Synta and Sunny agreeing to not to bid on RFQs for each other's product offerings;

    e.      Synta and Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

    f.       Synta and Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

197.   The Defendants have willfully engaged in predatory or anticompetitive conduct with the specific intent of monopolizing the consumer telescope market through the aforementioned conduct plus:

    a.      Colluding to prevent Jinghua from acquiring Meade;

    b.      Making false representations to the FTC regarding Synta's involvement in Sunny's acquisition of Meade; and

    c.      Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

198.   The anticompetitive conduct described herein undertaken by the Defendants create a dangerous probability that the Defendants will achieve monopoly power in the consumer telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

199.   The Defendants' predatory and anticompetitive conduct described herein, which

1    was done with the intent of monopolizing the consumer telescope market, injured, and continues

2    to injure, Plaintiffs and members of the Nationwide Class in their property by:

3             a.    Restricting output and limiting consumer choice in the consumer telescope

4                   market; and

5             b.    Forcing Plaintiffs and members of the Nationwide Class to pay artificially

6                   high, supracompetitive prices for telescopes.

7    200.  The injury to Plaintiffs and members of the Nationwide Class was a foreseeable

8    consequence of the Defendants' predatory and unlawful conduct, described herein, which was

9    done with the intent of monopolizing the consumer telescope market.

10   201.  Plaintiffs and members of the Nationwide Class have suffered irreparable harm and

11   do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide

12   Class seek injunctive and equitable relief.

13                          **Fourth Cause of Action**
                **Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**
14             **(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

15   202.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

16   203.  As a result of Sunny's acquisition of Meade and Synta's facilitation thereof, Synta

17   and Sunny has been able to exercise market power in the consumer telescope manufacturing and

18   distribution markets. The acquisition created the largest syndicates of telescope manufacturers

19   globally and telescope distributors in the United States. Both markets are highly concentrated and

20   the acquisition further significantly increased market concentration.

21   204.  It is unlikely that entry into the market would remedy, in a timely manner, the

22   anticompetitive effects from Sunny's acquisition of Meade in 2013. Entry is difficult and likely

23   to take years because of the intellectual property needed to manufacture telescopes, the time

24   required to plan for and to complete manufacturing facilities, and the time required to plan for and

25   establish the distribution channels.

26   205.  The effect of the mergers substantially lessens competition in the provision of in

27   violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, in the following ways:

28             a.    Eliminating actual, direct, and substantial competition between Synta and

---

**CLASS ACTION COMPLAINT**                                                           53

Sunny in the consumer telescope manufacturing and distribution markets;

b.   Increasing the ability of the merged entities to unilaterally raise prices of consumer telescopes;

c.   Eliminating Meade as a substantial and independent competitor in the consumer telescope manufacturing and distribution market;

d.   Eliminating the diversity of product offerings by Defendants;

e.   Increasing the prices of telescopes to consumers; and

f.   Reducing incentives to improve product quality in the relevant markets.

206.   Sunny's acquisition of Meade has substantially lessened competition in the consumer telescope manufacturing and distribution markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 as well as decreased telescope product options and increased telescope prices to consumers.

**Fifth Cause of Action**
**Violation of the State Antitrust Laws**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, on Behalf of the State Damages Classes)**

207.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

208.   During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of telescopes in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

209.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for telescopes and to allocate products and customers in the United States.

210.   In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a.   participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price telescopes at certain

levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to telescopes sold in the United States;

    b.    allocating products and customers in the United States in furtherance of their agreements; and

    c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

211. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products and customers.

212. The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

213. The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Arizona; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

    b.    During the Class Period, the Defendants' illegal conduct substantially affected Arizona commerce.

    c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, the Defendants entered into agreements in

restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

214.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

a.   During the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. The Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, telescopes at supra-competitive levels.

b.   The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, telescopes.

c.   For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of telescopes; and (2) Allocating among themselves the production of telescopes.

d.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) Price competition in the sale of telescopes has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for telescopes sold by the Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United

States; and (3) Those who purchased telescopes directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

    e.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for telescopes than they otherwise would have paid in the absence of the Defendants' unlawful conduct. As a result of the Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

215.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26.

    a.    Connecticut's legislature conferred broad standing under the Connecticut Antitrust Act based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace.

    b.    Under the Connecticut Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Conn. Gen. Stat. § 35-46a.

    c.    Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-26.

    d.    Every contract, combination, or conspiracy that has the purpose of effect of fixing, controlling, or maintaining prices in any part of trade or commerce; or of fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of any part of trade or commerce, is also unlawful. Conn. Gen. Stat. § 35-28.

    e.    Defendants made contracts or engaged in a combination or conspiracy with

each other by maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of telescopes for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for telescopes within the intrastate commerce of Connecticut.

f.   Plaintiffs purchased telescopes within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of telescopes would have been lower, in an amount to be determined at trial.

g.   Plaintiffs and members of the Class were injured with respect to purchases of telescopes in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs, and injunctive relief.

h.   Sec. 35-44b. Judicial construction of Connecticut Antitrust Act. It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.

216.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct,

1              Plaintiffs and members of the Damages Class have been injured in their

2              business and property and are threatened with further injury.

3     d.     By reason of the foregoing, the Defendants have entered into agreements in

4              restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501,

5              *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

6              forms of relief available under District of Columbia Code Ann. §§ 28-4501,

7              *et seq.*

8    217.   The Defendants have entered into an unlawful agreement in restraint of trade in

9  violation of the Illinois Antitrust Act, 740ILCS10/1, *et seq.*

10     a.     The Illinois Antitrust Act,740ILCS10/1, *et seq.*, aims to promote the

11              unhampered growth of commerce and industry throughout the State by

12              prohibiting restraints of trade which are secured through monopolistic or

13              oligarchic practices and which act or tend to act to decrease competition

14              between and among persons engaged in commerce and trade . . . ." 740 ILCS

15              10/2.

16     b.     Plaintiffs purchased telescopes within the State of Illinois during the Class

17              Period. But for Defendants' conduct set forth herein, the price for telescopes

18              would have been lower, in an amount to be determined at trial.

19     c.     Under the Illinois Antitrust Act, indirect purchasers have standing to

20              maintain an action for damages based on the facts alleged in this Complaint.

21              740 ILCS 10/7(2).

22     d.     Defendants made contracts or engaged in a combination or conspiracy with

23              each other, though they would have been competitors but for their prior

24              agreement, for the purpose of fixing, controlling, or maintaining prices for

25              telescopes sold, and/or for allocating products and customers within the

26              intrastate commerce of Illinois.

27     e.     Defendants further unreasonably restrained trade or commerce and

28              established, maintained or attempted to acquire monopoly power over the

**CLASS ACTION COMPLAINT**                                                          59

market for telescopes in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq.*

218.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Iowa; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    During the Class Period, the Defendants' illegal conduct substantially affected Iowa commerce.

    c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

219.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Kansas; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for telescopes.

b.   During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

220.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Maine; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

**CLASS ACTION COMPLAINT**                                                                 61

221.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

  a. The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Michigan; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

  b. During the Class Period, the Defendants' illegal conduct substantially affected Michigan commerce.

  c. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

  d. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

222.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

  a. The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

  b. During the Class Period, the Defendants' illegal conduct substantially

affected Minnesota commerce.

    c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

223.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

    b.    During the Class Period, the Defendants' illegal conduct substantially affected Mississippi commerce.

    c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

224.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

a.  The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  During the Class Period, the Defendants' illegal conduct substantially affected Nebraska commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

225.  The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

a.  The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nevada; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct,

**CLASS ACTION COMPLAINT**                                                    64

1  Plaintiffs and members of the Damages Class have been injured in their
2  business and property and are threatened with further injury.

3  d.  By reason of the foregoing, the Defendants have entered into agreements in
4  restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*
5  Accordingly, Plaintiffs and members of the Damages Class seek all relief
6  available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

7  226.  The Defendants have entered into an unlawful agreement in restraint of trade in
8  violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

9  a.  The Defendants' combination or conspiracy had the following effects: (1)
10  telescope price competition was restrained, suppressed, and eliminated
11  throughout New Hampshire; (2) telescope prices were raised, fixed,
12  maintained and stabilized at artificially high levels throughout New
13  Hampshire; (3) Plaintiffs and members of the Damages Class were deprived
14  of free and open competition; and (4) Plaintiffs and members of the
15  Damages Class paid supra-competitive, artificially inflated prices for
16  telescopes.

17  b.  During the Class Period, the Defendants' illegal conduct substantially
18  affected New Hampshire commerce.

19  c.  As a direct and proximate result of the Defendants' unlawful conduct,
20  Plaintiffs and members of the Damages Class have been injured in their
21  business and property and are threatened with further injury.

22  d.  By reason of the foregoing, the Defendants have entered into agreements in
23  restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1,
24  *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all
25  relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

26  227.  The Defendants have entered into an unlawful agreement in restraint of trade in
27  violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

28  a.  The Defendants' combination or conspiracy had the following effects: (1)

**CLASS ACTION COMPLAINT**                                      65

telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

228.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New York; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes when they purchased telescopes, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

b. During the Class Period, the Defendants' illegal conduct substantially affected New York commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

229. The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

a. The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief

1 available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

2   230.   The Defendants have entered into an unlawful agreement in restraint of trade in

3 violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

    a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.   During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

    c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

  231.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

    a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Oregon; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

**CLASS ACTION COMPLAINT**                                                                                 68

b.   During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

232.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a.   The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

233.   The Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

    c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

234.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq.*

    a.    The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Utah; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Utah commerce.

1    c.  As a direct and proximate result of the Defendants' unlawful conduct,

2        Plaintiffs and members of the Damages Class have been injured in their

3        business and property and are threatened with further injury.

4    d.  By reason of the foregoing, the Defendants' have entered into agreements in

5        restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*.

6        Accordingly, Plaintiffs and members of the Damages Class seek all relief

7        available under Utah Code Annotated §§ 76-10-3101, *et seq*.

8  235. The Defendants have entered into an unlawful agreement in restraint of trade in

9 violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

10    a.  The Defendants' combination or conspiracy had the following effects: (1)

11        telescope price competition was restrained, suppressed, and eliminated

12        throughout Vermont; (2) telescope prices were raised, fixed, maintained and

13        stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and

14        members of the Damages Class were deprived of free and open competition;

15        and (4) Plaintiffs and members of the Damages Class paid supra-

16        competitive, artificially inflated prices for telescopes.

17    b.  During the Class Period, the Defendants' illegal conduct had a substantial

18        effect on Vermont commerce.

19    c.  As a direct and proximate result of the Defendants' unlawful conduct,

20        Plaintiffs and members of the Damages Class have been injured in their

21        business and property and are threatened with further injury.

22    d.  By reason of the foregoing, the Defendants have entered into agreements in

23        restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.

24        Accordingly, Plaintiffs and members of the Damages Class seek all relief

25        available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

26  236. The Defendants have entered into an unlawful agreement in restraint of trade in

27 violation of the West Virginia Code §§ 47-18-1, *et seq*.

28    a.  The Defendants' combination or conspiracy had the following effects: (1)

telescope price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

237.  The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

a.  The Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

     d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

238.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of the Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for telescopes than they otherwise would have paid in the absence of the Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

239.   In addition, the Defendants have profited significantly from the aforesaid conspiracy. The Defendants' profits derived from its anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

240.   Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**Sixth Cause of Action**
**Violation of State Consumer Protection Laws**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, on Behalf of the State Damages Classes)**

241.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

242.   The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

243.   The Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

     a.    The Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-

competitive and artificially inflated levels, the prices at which telescopes were sold, distributed, or obtained in Arkansas and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.      The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.      The Defendants' unlawful conduct had the following effects: (1) telescope Products price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) telescope Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.      During the Class Period, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.      The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

244.   The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

a.      During the Class Period, the Defendants marketed, sold, or distributed telescopes in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California

Business and Professions Code, by engaging in the acts and practices specified above.

b.  This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c.  The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

d.  The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

e.  The Defendants' acts or practices are unfair to purchasers of telescopes in the State of California within the meaning of Section 17200, California Business and Professions Code;

f.  The Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

g.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and

**CLASS ACTION COMPLAINT**                                                                 75

benefits that may have been obtained by the Defendants as a result of such business acts or practices.

h.   The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

i.   The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for telescopes. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

j.   The conduct of the Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

k.   As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

245.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

a.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which telescopes were sold, distributed or obtained in the District of Columbia.

b.   The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they

were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for telescopes. The Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing telescopes because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges. The Defendants' conduct with regard to sales of telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public. The Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from the Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c.   The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for telescope.

d.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and

1    members of the Damages Class seek all relief available under that statute.

2    246.   The Defendants have engaged in unfair competition or unfair, unconscionable, or

3    deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act,

4    Fla. Stat. §§ 501.201, *et seq*.

5        a.    The Defendants' unlawful conduct had the following effects: (1) telescope

6              price competition was restrained, suppressed, and eliminated throughout

7              Florida; (2) telescope prices were raised, fixed, maintained, and stabilized at

8              artificially high levels throughout Florida; (3) Plaintiffs and members of the

9              Damages Class were deprived of free and open competition; and (4)

10             Plaintiffs and members of the Damages Class paid supra-competitive,

11             artificially inflated prices for telescopes.

12       b.    During the Class Period, the Defendants' illegal conduct substantially

13             affected Florida commerce and consumers.

14       c.    As a direct and proximate result of the Defendants' unlawful conduct,

15             Plaintiffs and members of the Damages Class have been injured and are

16             threatened with further injury.

17       d.    The Defendants have engaged in unfair competition or unfair or deceptive

18             acts or practices in violation of Florida Stat. § 501.201, *et seq*., and,

19             accordingly, Plaintiffs and members of the Damages Class seek all relief

20             available under that statute.

21   247.   The Defendants have engaged in unfair competition or unfair, unconscionable, or

22   deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

23       a.    The Defendants' unlawful conduct had the following effects: (1) telescope

24             price competition was restrained, suppressed, and eliminated throughout

25             Hawaii; (2) telescope prices were raised, fixed, maintained, and stabilized at

26             artificially high levels throughout Hawaii; (3) Plaintiffs and members of the

27             Damages Class were deprived of free and open competition; and (4)

28             Plaintiffs and members of the Damages Class paid supra-competitive,

**CLASS ACTION COMPLAINT**                                                    78

1        artificially inflated prices for telescopes.

2    b.    During the Class Period, the Defendants' illegal conduct substantially

3         affected Hawaii commerce and consumers.

4    c.    As a direct and proximate result of the Defendants' unlawful conduct,

5         Plaintiffs and members of the Damages Class have been injured and are

6         threatened with further injury.

7    d.    The Defendants have engaged in unfair competition or unfair or deceptive

8         acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and,

9         accordingly, Plaintiffs and members of the Damages Class seek all relief

10        available under that statute.

11    248.   The Defendants have engaged in unfair competition or unfair, unconscionable, or

12   deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

13    a.    The Defendants were engaged in trade or commerce as defined by G.L. c.

14        93A.

15    b.    The Defendants agreed to, and did in fact, act in restraint of trade or

16        commerce in a market which includes Massachusetts, by affecting, fixing,

17        controlling and/or maintaining at artificial and non-competitive levels, the

18        prices at which telescopes were sold, distributed, or obtained in

19        Massachusetts and took efforts to conceal its agreements from Plaintiffs and

20        members of the Damages Class.

21    c.    The Defendants' unlawful conduct had the following effects: (1) telescopes

22        price competition was restrained, suppressed, and eliminated throughout

23        Massachusetts; (2) telescopes prices were raised, fixed, maintained, and

24        stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs

25        and members of the Damages Class were deprived of free and open

26        competition; and (4) Plaintiffs and members of the Damages Class paid

27        supra-competitive, artificially inflated prices for telescopes.

28    d.    As a direct and proximate result of the Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

e.    The Defendants have been or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each of the Defendants served has failed to make a reasonable settlement offer.

f.    By reason of the foregoing, the Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. The Defendants and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

249.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

a.    Plaintiffs and the Damages Class purchased telescopes for personal, family, or household purposes.

b.    The Defendants engaged in the conduct described herein in connection with the sale of telescopes in trade or commerce in a market that includes Missouri.

c.    The Defendants agreed to, and did in fact, affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d. The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased.

e. The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in telescopes by making public statements that were not in accord with the facts.

f. The Defendants' statements and conduct concerning the price of telescopes were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing telescopes at prices established by a free and fair market.

g. The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Missouri; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

i. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

j. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any

person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

250.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

    a.   The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Montana; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.   During the Class Period, The Defendants' illegal conduct substantially affected Montana commerce and consumers.

    c.   As a direct and proximate result of The Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

    d.   The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

251.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

a.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which telescopes were sold, distributed or obtained in New Mexico and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for telescopes as set forth in N.M.S.A., § 57-12-2E. Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for telescopes. The Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing telescopes because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges. the Defendants' conduct with regard to sales of telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public. the Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from the Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c.    The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.    During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

f.    the Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

252.    the Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

a.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in New York and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.    The Defendants and their co-conspirators made public statements about the prices of telescopes and products containing telescopes that the Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price

increases for telescopes and products containing telescopes; and the Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

c.    Because of the Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased telescopes were misled to believe that they were paying a fair price for telescopes or the price increases for telescopes were for valid business reasons; and similarly situated consumers were potentially affected by the Defendants' conspiracy.

d.    The Defendants knew that its unlawful trade practices with respect to pricing telescopes would have an impact on New York consumers and not just the Defendants' direct customers.

e.    The Defendants knew that their unlawful trade practices with respect to pricing telescopes would have a broad impact, causing consumer class members who indirectly purchased telescopes to be injured by paying more for telescopes than they would have paid in the absence of the Defendants' unlawful trade acts and practices.

f.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.    The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New York; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h.  During the Class Period, the Defendants marketed, sold, or distributed telescopes in New York, and the Defendants' illegal conduct substantially affected New York commerce and consumers.

i.  During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in New York.

j.  Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

253.  The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

a.  The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in North Carolina and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.  The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up its illegal acts. Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy. The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. The Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. The Defendants' public statements concerning the price of telescopes created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by the Defendants' illegal conspiracy. Moreover, the Defendants deceptively concealed its unlawful activities by

mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

c.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.  The Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e.  During the Class Period, the Defendants marketed, sold, or distributed telescopes in North Carolina, and the Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.  During the Class Period, the Defendants, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in North Carolina.

g.  Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and

1    members of the Damages Class seek all relief available under that statute.

2    254.   The Defendants have engaged in unfair competition or unfair, unconscionable, or

3    deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer

4    Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

5         a.   Members of this Damages Class purchased telescopes for personal, family,

6              or household purposes.

7         b.   The Defendants agreed to, and did in fact, act in restraint of trade or

8              commerce in a market that includes Rhode Island, by affecting, fixing,

9              controlling, and/or maintaining, at artificial and non-competitive levels, the

10             prices at which telescopes were sold, distributed, or obtained in Rhode

11             Island.

12        c.   The Defendants deliberately failed to disclose material facts to Plaintiffs and

13             members of the Damages Class concerning its unlawful activities and

14             artificially inflated prices for telescopes. The Defendants owed a duty to

15             disclose such facts, and considering the relative lack of sophistication of the

16             average, non-business consumer, it breached that duty by its silence. The

17             Defendants misrepresented to all consumers during the Class Period that its

18             telescope prices were competitive and fair.

19        d.   The Defendants' unlawful conduct had the following effects: (1) telescope

20             price competition was restrained, suppressed, and eliminated throughout

21             Rhode Island; (2) telescope prices were raised, fixed, maintained, and

22             stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs

23             and members of the Damages Class were deprived of free and open

24             competition; and (4) Plaintiffs and members of the Damages Class paid

25             supra-competitive, artificially inflated prices for telescopes.

26        e.   As a direct and proximate result of the Defendants' violations of law,

27             Plaintiffs and members of the Damages Class suffered an ascertainable loss

28             of money or property as a result of the Defendants' use or employment of

unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

   f. The Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of telescopes, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. The Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

 255. The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

   a. The Defendants' combination or conspiracy had the following effects: (1) telescopes price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

   b. During the Class Period, the Defendants' illegal conduct had a substantial effect on South Carolina commerce.

   c. As a direct and proximate result of the Defendants' unlawful conduct,

**CLASS ACTION COMPLAINT**                89

1    Plaintiffs and members of the Damages Class have been injured in their

2    business and property and are threatened with further injury.

3    d.    The Defendants have engaged in unfair competition or unfair or deceptive

4    acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and,

5    accordingly, Plaintiffs and the members of the Damages Class seek all relief

6    available under that statute.

7    256.    The Defendants have engaged in unfair competition or unfair, unconscionable, or

8    deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

9    a.    The Defendants agreed to, and did in fact, act in restraint of trade or

10    commerce in a market that includes Vermont by affecting, fixing,

11    controlling, and/or maintaining, at artificial and non-competitive levels, the

12    prices at which telescopes were sold, distributed, or obtained in Vermont.

13    b.    The Defendants deliberately failed to disclose material facts to Plaintiffs and

14    members of the Damages Class concerning its unlawful activities and

15    artificially inflated prices for telescopes. The Defendants owed a duty to

16    disclose such facts, and considering the relative lack of sophistication of the

17    average, non-business consumer, The Defendants breached that duty by its

18    silence. The Defendants misrepresented to all consumers during the Class

19    Period that its telescope prices were competitive and fair.

20    c.    The Defendants' unlawful conduct had the following effects: (1) telescope

21    price competition was restrained, suppressed, and eliminated throughout

22    Vermont; (2) telescope prices were raised, fixed, maintained, and stabilized

23    at artificially high levels throughout Vermont; (3) Plaintiffs and members of

24    the Damages Class were deprived of free and open competition; and (4)

25    Plaintiffs and members of the Damages Class paid supra-competitive,

26    artificially inflated prices for telescopes.

27    d.    As a direct and proximate result of the Defendants' violations of law,

28    Plaintiffs and members of the Damages Class suffered an ascertainable loss

**CLASS ACTION COMPLAINT**                                                                 90

of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

e.     The Defendants' deception, including its affirmative misrepresentations and omissions concerning the prices of telescopes, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. The Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Seventh Cause of Action Against All Defendants**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, on Behalf of the State Damages Classes)**

257.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

258.   Plaintiffs bring this claim under the laws of each of the Indirect Purchaser States.

259.   As a result of its unlawful conduct described above, the Defendants have and will continue to be unjustly enriched. The Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of telescopes.

260.   The Defendants have benefited from its unlawful acts and it would be inequitable for the Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for telescopes.

261.   Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

262.   Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased telescopes subject to the Defendants' conspiracy would have been futile.

**IX.   PRAYER FOR RELIEF**

263.   Accordingly, Plaintiffs respectfully request that:

264.   The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Class as provided by Rule 23(c)(2).

265.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

      a.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

      b.   A *per se* violation of Section 1 of the Sherman Act;

      c.   An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and consumer protection laws as set forth herein; and

      d.   Acts of unjust enrichment by the Defendants as set forth herein.

266.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against the Defendants in an amount to be trebled to the extent such laws permit;

267.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

268.   The Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination

alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

269.   Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits the Defendants obtained as a result of its acts of unfair competition and acts of unjust enrichment;

270.   Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

271.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

272.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED: June 17, 2020                     Respectfully submitted,


By: */s/ Adam J. Zapala*
Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G.B. Dallal (SBN 277826)
Reid W. Gaa (SBN 330141)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com
rgaa@cpmlegal.com

**CLASS ACTION COMPLAINT**                     93

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## X.    JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.


DATED: June 17, 2020                    Respectfully submitted,


                                        */s/ Adam J. Zapala*
                                        Adam J. Zapala (SBN 245748)
                                        **COTCHETT, PITRE & McCARTHY, LLP**
                                        840 Malcolm Road
                                        Burlingame, CA 94010
                                        Telephone: (650) 697-6000
                                        Facsimile: (650) 697-0577
                                        azapala@cpmlegal.com

**CLASS ACTION COMPLAINT**                                              94